# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

LANCE DOWNES-COVINGTON,       )
SOLDADERA SANCHEZ, ROBERT     )
O'BRIEN, EMILY DRISCOLL, ALISON )        Case No.: 2:20-cv-01790-GMN-DJA
KENADY, TENISHA MARTIN, GABRIELA )
MOLINA                        )        **AMENDED ORDER[1]**
                              )
          Plaintiffs,         )
     vs.                      )
                              )
LAS VEGAS METROPOLITAN POLICE )
DEPARTMENT, JOSEPH LOMBARDO,  )
KURT MCKENZIE, TABATHA DICKSON )
                              )
          Defendants.         )
_____)

Pending before the Court are Plaintiffs' Lance Downes-Covington, Soldadera Sanchez, Robert O'Brien, Emily Driscoll, Alison Kenady, Tenisha Martin, and Gabriela Molina (collectively, "Plaintiffs'") Motion for Temporary Restraining Order, (ECF No. 15), and Motion for Preliminary Injunction, (ECF No. 16).  Defendants Las Vegas Metropolitan Police Department, Joseph Lombardo, Kurt McKenzie, and Tabatha Dickson (collectively, "Defendants") filed Responses, (ECF Nos. 25–26), and Plaintiffs filed Replies, (ECF No. 30–31).

Also pending before the Court are Plaintiffs' Motion for Leave to File Excess Pages, (ECF No. 14), and Defendants' Motion for Leave to File Excess Pages, (ECF No. 23).

For the reasons discussed below, the Court **DENIES** Plaintiffs' Motion for Temporary Restraining Order and Motion for Preliminary Injunction, **GRANTS *nunc pro tunc*** Plaintiffs'

---

[1] The only change from the previous Order, (ECF No. 32), is a correction of the ECF Nos. for Plaintiffs' Motion for Temporary Restraining Order and Motion for Preliminary Injunction in the below conclusion.

Motion for Leave to File Excess Pages, and **GRANTS *nunc pro tunc*** Defendants' Motion for Leave to File Excess Pages.

I.   **BACKGROUND**

   This case arises from injuries Plaintiffs allegedly sustained from Defendants' crowd control tactics at a series of protests following the death of George Floyd in May 2020. Protesting police brutality and systemic racism, many people have organized not only in Las Vegas but in cities all around the United States. *See Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1211 (W.D. Wash. 2020) (acknowledging that "nationwide outrage and protest has ensued" since George Floyd's death). In Las Vegas specifically, a total of 77 protests took place between May 29, 2020 and July 31, 2020. (Metro's After-Action Report ("Report") at 6, Ex. A to Defs.' Resp., ECF No. 25-1). The parties agree that the majority of attendees at these protests have been peaceful. (Defs.' Resp. 10:2–3, ECF No. 25).  However, on some occasions, protestors have grown violent, throwing rocks, bottles, and fireworks at officers. (*Id.* 10:5–6).

   Plaintiffs allege that Defendants used violent crowd control tactics and threats of force against Plaintiffs, other protestors, and legal observers at various protests, but specifically those on May 30, 2020; June 1, 2020; June 13, 2020; and July 4, 2020. (Pls.' Mots. TRO and Prelim. Inj. ("Motions") 10:10–12, ECF No. 15).  The alleged unlawful tactics include: "kettling"[2] (i.e., the confinement of demonstrators or protestors in a small area as a method of crowd control), the use of tear gas or other gases capable of irritation and/or disorientation, and the use of Oleoresin Capsicum ("OC") projectiles or "pepperballs." (*Id.* 10:13–17).

---

[2] Plaintiffs allege Metro unconstitutionally used kettling during various protests but provide little briefing on Metro's use of kettling. (Pls.' Mots. 10:14–15).

Accordingly, Plaintiffs seek injunctive relief, ordering Las Vegas Metro Police Department ("Metro") to follow its own Use of Force Policy, and consistent with that Policy, enjoining Metro from engaging in the following actions:

1. Using tear gas (or other similar substances) against peaceful protesters;
2. Firing pepperballs (or other similar projectiles) at peaceful protesters;
3. Firing rubber bullets (or other similar projectiles) at peaceful protesters;
4. Firing flash bang grenades (or other similar weapons) at peaceful protesters;
5. Failing to display officer name badges while engaged in official duties in public places;
6. Failing to provide officer names and/or badge numbers while engaged in official duties in public places, upon request;
7. "Kettling" and/or trapping peaceful protesters and preventing them means of escape and/or movement.

(*Id*. 11:6–15). The Court provides a brief overview of Metro's Use of Force Policy before addressing the alleged violations thereof at the protests implicated in the present Motions.

**A. Metro's Use of Force Policy**

Under Metro's Use of Force Policy ("Policy"),[3] "[o]fficers will only use a level of force that is objectively reasonable to bring an incident or persons under control and to safely accomplish a lawful purpose." (Metro's Current Use of Force Policy ("Policy"), Ex. 9 to Pls.' Mots., ECF No. 15-9). The Policy reviews the various levels of tactics officers may use and the circumstances under which they can use them to effectively address or de-escalate the situation while maintaining officer and public safety. As to OC spray, the Policy states that, "in a protest or demonstration situation, OC spray may only be used when authorized by an incident commander in response to imminent threat of harm . . . and it will not be used for the dispersal of non-violent persons." (Policy at 12, VI.2.f.). As to projectile weapons, the Policy similarly

---

[3] Metro updated its Use of Force Policy on July 8, 2020. (*See* Policy). The parties do not dispute that this Policy went into effect prior to the four protests at issue.

disapproves usage "in a civil unrest situation unless authorized by an incident commander or above." (Policy at 16, XI.6.a.).

**B.  May 30, 2020 Protest**

Plaintiffs Soladera Sanchez ("Sanchez"), Tenisha Martin ("Martin"), and Robert O'Brien ("O'Brien") attended the May 30, 2020 protest. (Sanchez's Decl. ¶ 5, Ex. 2 to Pls.' Mots., ECF No. 15-2); (Martin's Decl. ¶ 7, Ex. 6 to Pls.' Mots., ECF No. 15-6); (O'Brien's Decl. ¶ 3, Ex. 3 to Pls.' Mots., ECF No. 15-3).  Plaintiffs allege that during the course of the protest, Metro officers unlawfully fired pepperballs and tear gas on Plaintiffs and other peaceful protestors. (Pls.' Mots. 15:13–15, 16:13–14).

Plaintiffs Sanchez and Martin organized the event, called "Organize the State Out/No More Stolen Lives Rally." (Sanchez's Decl. ¶ 5); (Martin's Decl. ¶ 7).  Plaintiff O'Brien also attended the protest as a legal observer. (O'Brien's Decl. ¶¶ 3–4).  Dressed professionally in court attire, O'Brien attended the protest for the sole purpose of observation. (*Id*.).  Metro was informed that legal observers would be present and dressed in red shirts and/or suits. (*Id*. ¶ 5).

The event began at the Container Park around 7:00 p.m. (Sanchez's Decl. ¶ 9); (O'Brien's Decl. ¶ 6); (Martin's Decl. ¶¶ 9–10).  Around 7:00 p.m. or 8:00 p.m., the crowd began taking over roadways, impeding traffic and causing safety hazards. (Defs.' Mots. 12:4–5); (Exs. D, E, F, and G to Defs.' Resp).  Around this time, Metro announced over bullhorns that protestors needed to move to the sidewalk and gave a five-minute warning that anyone who did not move onto the sidewalk within five minutes would be arrested. (O'Brien's Decl. ¶¶ 8–9).  O'Brien observed that the volume was "too low to have been heard by people in the back of the protest, fifty yards away." (O'Brien's Decl. ¶ 10).  Because protestors refused to obey officers' commands, Lieutenant Melanie O'Daniel ("Lt. O'Daniel"), at the direction of the Incident Commander, deployed SWAT officers. (Lt. O'Daniel's Decl. ¶ 29, Ex. B to Defs.' Resp., ECF No. 25-2).

SWAT fired pepperballs and tear-gas at groups of protestors. (Lt. O'Daniel's Decl. ¶ 30). Sanchez was not directly hit, but upon exposure to the pepperballs and/or teargas, "was overtaken by a burning feeling deep in [her] lungs, making it impossible to breathe." (Sanchez's Decl. ¶¶ 10–12).  O'Brien, on the other hand, testified that he was struck by three or four projectiles on his left side as he was retreating from the police. (O'Brien's Decl. ¶ 17).  As he retreated, O'Brien was hit by two more projectiles. (*Id.* ¶ 18).

Between 10:00 p.m. and 10:30 p.m., Martin, Sanchez, and others gathered their supplies at the Container Park, preparing to leave the protest. (Martin's Decl. ¶ 16).  They heard police say "disperse, disperse, disperse" from afar, but did not realize Metro directed the order at them until SWAT officers appeared twenty feet in front of them. (Martin's Decl. ¶¶ 17–18).  Without warning, Metro shot three tear gas canisters at Sanchez, Martin, and others. (Martin's Decl. ¶¶ 19–21).  Through the night, various non-parties looted businesses, vandalized properties, and even set patrol vehicles on fire. (Report at 9–12).

**C.  June 1, 2020 Protest**

Plaintiff Lance Downes-Covington ("Downes-Covington") attended the June 1, 2020 protest. (Downes-Covington's Decl. ¶ 4, Ex. 1 to Pls.' Mots., ECF No. 15-1).  Plaintiff Downes-Covington alleges that during the course of the protest, Metro officers unlawfully fired pepperballs at Plaintiff and other peaceful protestors and used excessive force when detaining Plaintiff. (Downes-Covington's Decl. ¶ 14).

The June 1, 2020 protest mainly occurred near the Trump International Hotel at Fashion Show Drive and at the Lloyd D. George Federal Courthouse. (Report at 14–17). Approximately 5,000 protestors attended the protest on June 1, 2020. (*See* Report.).  During the protest, Downes-Covington recounts that officers fired a series of pepperball rounds while he

and his friends were peacefully singing on the steps of the federal courthouse. (*Id*. ¶ 14).  It is unclear whether these officers were Metro officers or U.S. Marshalls.[4]

While Downes-Covington was waiting for a Lyft, he observed officers detaining protestors and throwing them to the ground.  (Downes-Covington's Decl. ¶¶ 24–25).  Downes-Covington started recording the encounter when a Metro officer saw him, tackled him to the ground and detained him. (Downes-Covington's Decl. ¶¶ 26–27); (Defs.' Mots. 33:12–13).

**D.  June 13, 2020 Protest**

Plaintiffs Sanchez, Martin, Emily Driscoll ("Driscoll"), Gabriela Molina ("Molina"), and Alison Kenady ("Kenady") attended the June 13, 2020 protest. (Sanchez's Decl. ¶ 17); (Martin's Decl. ¶ 26); (Driscoll's Decl. ¶ 3, Ex. 4 to Pls.' Mots., ECF No. 15-4); (Molina's Decl. ¶ 5, Ex. 7 to Pls.' Mots., ECF No. 15-7); (Kenady's Decl. ¶ 4, Ex. 5 to Pls.' Mots., ECF No. 15-5).  Plaintiffs Sanchez, Martin, Driscoll, Molina, and Kenady allege that during the course of the protest, Metro officers used pepperballs and/or tear gas on Plaintiffs and other peaceful protestors, failed to display officer name badges, failed to provide officers' names upon request, and engaged in kettling during the protest. (Pls.' Mots. 20:25–26, 22:14–16, 23:17–22).

Sanchez and Martin co-organized the protest on June 13, 2020, named "Stop Killing US/Justice and Power March." (Sanchez's Decl. ¶ 17); (Martin's Decl. ¶ 26).  Driscoll and Molina attended as legal observers. (Driscoll's Decl. ¶ 3); (Molina's Decl. ¶ 5).  Both wore red shirts and carried legal notepads to identify themselves as legal observers. (Molina's Decl. ¶ 7). Because other legal observers had attended protests prior to the June 13, 2020 protest, Molina believes that "Metro officers should have easily been able to identify [Molina] and others as

---

[4] Metro states that SWAT was not deployed to the federal courthouse and that SWAT did not use pepperballs at or near the federal courthouse on June 1, 2020, implying that United States Marshalls used pepperballs, not Defendants, during this protest. (Lt. O'Daniel's Decl. ¶ 37).  Plaintiffs, in their Replies, request that the Court not merely accept Metro's allegation as true because Plaintiff Downes-Covington was falsely told he was not shot and was later detained by Metro officers. (Pls.' Replies at 6 n.4).

legal observers." (*Id*.).  Kenady participated as a protestor during the June 13, 2020 protest.
(Kenady's Decl. ¶ 4).

Plaintiffs allege that the protest began around 6:00 p.m. in front of the Bellagio Hotel and
Casino. (Pls.' Mots.' 20:3–4).  The co-organizers, Sanchez and Martin, planned to march south
on Las Vegas Boulevard from the Bellagio Hotel and Casino to the "Welcome to Las Vegas"
sign where they would end the protest and disperse. (Sanchez's Decl. ¶ 18); (Martin's Decl. ¶
11).  As the protestors marched, protestors took over the street, impeding traffic and causing
safety hazards. (Defs.' Mots. 14:21–22); (Exs. P and Q to Defs.' Resp.).  At multiple points
during the protest, officers ordered protestors to keep off the streets. (*Id*.).  The protestors,
including Plaintiffs present at the protest, generally complied. (*Id*.).  During the route, officers
created a skirmish line based on their concern that the protestors were going to take over
Interstate-15.[5] (Lt. O'Daniel's Decl. ¶ 46).  At this point, Lt. O'Daniel, upon receiving
authorization from the Incident Commander, deployed SWAT. (*Id*. ¶ 48).

Around 7:45pm, police gave dispersal orders to the group of protestors.  Plaintiffs allege
that they attempted to comply with Metro's dispersal orders but were trapped. (Driscoll's Decl.
¶ 18); (Kenady's Decl. ¶ 7).  They "could not go forward over the freeway and could not go
backward because police were blocking [them]." (Sanchez's Decl. ¶ 31).  At this time, SWAT
fired multiple projectile chemical irritants at the crowd.[6] (Sanchez's Decl. ¶ 32); (Ex. 27 to Pls.'
Mots., ECF No. 15-27); (Defs.' Mots. 15:14–15).  None of the Plaintiffs were directly hit but
were directly exposed to the chemical irritants. (Sanchez's Decl. ¶ 33); (Ex. 27 to Pls.' Mots.).
Plaintiffs present at the protest testify that they had difficulty breathing, their eyes burned and

---

[5] Lt. O'Daniel and other officers learned from Facebook Live videos that protestors intended to overtake the
Interstate-15 on-ramp. (Lt. O'Daniel's Decl. ¶ 47).  This video, combined with the prior incident on May 30,
2020 where protestors took over the 95 Freeway, lead Lt. O'Daniel to believe that there was a real concern that
protestors would overtake the Interstate-15 on-ramp during the June 13, 2020 protest. (Defs.' Mots. 15:12–14).

[6] It is unclear from the video whether SWAT deployed pepperballs or tear gas. (Ex. 27 to Pls.' Mots., ECF No.
15-27).

watered, and some of their personal property was damaged. (Sanchez's Decl. ¶ 33); (Kenady's Decl. ¶ 9); (Martin's Decl. ¶¶ 52–53, 55); (Molina's Decl. ¶¶ 29–32).

While the crowd moved away from Interstate-15, Driscoll and Molina, as legal observers, took photographs and videos of the police officers from the sidewalk. (Molina's Decl. ¶ 35).  Both asked some officers for their names, but officers, in response, snickered, smiled, and appeared to provide fake names. (Driscoll's Decl. ¶ 22); (Molina's Decl. ¶ 36).  A few minutes later, officers arrested another man. (Molina's Decl. ¶ 38).  Driscoll and Molina asked the officers for the name of the man who was arrested. (Molina's Decl. ¶ 38).  An officer then pointed to Driscoll and Molina, upon which two officers grabbed and detained them. (Driscoll's Decl. ¶ 24); (Molina's Decl. ¶ 39).  Both Driscoll and Molina were standing on the sidewalk when they were arrested. (Driscoll's Decl. ¶ 28); (Molina's Decl. ¶ 39).  Driscoll and Molina were not processed, but they each received citations for failing to walk on a sidewalk where provided, in violation of Nevada Revised Statutes § 484B.297(1). (Register of Actions regarding Driscoll and Molina, Ex. 31 to Pls.' Mots., ECF No. 15-31).

**E.  July 4, 2020 Protest**

Plaintiffs Sanchez and Martin attended the July 4, 2020 protest. (Sanchez's Decl. ¶ 44); (Martin's Decl. ¶ 62).  They allege that during the course of the protest, Defendants prohibited Plaintiffs and other protestors from lawfully protesting on the sidewalk. (Sanchez's Decl. ¶¶ 46–48).

Sanchez and Martin co-organized the protest which was staged in front of South Central Area Command, a Metro police station. (Sanchez's Decl. ¶ 44).  Protestors mainly stood on the sidewalk. (*Id*. ¶ 46).  At some point, Lieutenant Kurt McKenzie ("McKenzie") told Sanchez or Martin to move because their items were obstructing the sidewalk. (*Id*. ¶ 48).  Sanchez, Martin, and other protestors moved without incident. (*Id*.).  SWAT was not deployed during this protest. (Defs.' Resp. 16:1–2).

1    Plaintiffs argue that Metro's use of chemical irritants during these protests amount to

2  excessive force in violation of the Fourth Amendment and effectively chill speech in violation

3  of the First Amendment. (Pls.' Mots. 27:19–25).  Alleging that there is no indication that

4  protests or Metro's use of excessive force will cease, Plaintiffs accordingly seek injunctive

5  relief. (*Id.* 10:6–9).

6    On September 25, 2020, Plaintiffs filed their Complaint, (ECF No. 1), naming fourteen

7  causes of action, including nine federal claims (for excessive force, violation of First

8  Amendment free speech rights, chilling of free speech rights, retaliation, violation of First

9  Amendment right to assembly, violation of substantive due process rights, and violations of

10  equal protection) and five state law claims (for violation of free speech rights under Article 1, §

11  9 of the Nevada Constitution; excessive force in violation of Article 1, § 18 of the Nevada

12  Constitution; negligent training, supervision, and retention; conversion; and intentional

13  infliction of emotional distress). (Pls. Mots. 11:25–12:3).  Plaintiffs now move for preliminary

14  injunctive relief.

15  **II.    LEGAL STANDARD**

16    The same legal standard applies to both temporary restraining orders and preliminary

17  injunctions sought pursuant to Federal Rule of Civil Procedure 65. *See Stuhlbarg Int'l Sales*

18  *Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis

19  applied to temporary restraining orders and preliminary injunctions is "substantially identical").

20  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear

21  showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*,

22  555 U.S. 7, 24 (2008).  A court may grant such relief only upon a petitioner's showing of (1)

23  likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of

24  preliminary relief, (3) the balance of equities weighs in petitioner's favor, and (4) an injunction

25  is in the public interest. *Id*. at 20.  A temporary restraining order is distinguished by its

1  "underlying purpose of preserving the status quo and preventing irreparable harm just so long

2  as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of*

3  *Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); *see also* Fed. R. Civ.

4  P. 65(b) (limiting temporary restraining orders to 14 days unless extended for good cause, and

5  providing for expedited hearings on preliminary injunctions).

6         The Ninth Circuit has held that "serious questions going to the merits and a hardship

7  balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming

8  the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v.*

9  *Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

10        "The urgency of obtaining a preliminary injunction necessitates a prompt determination

11  and makes it difficult to obtain affidavits from persons who would be competent to testify at

12  trial.  The trial court may give even inadmissible evidence some weight, when to do so serves

13  the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734

14  F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright and A. Miller, Federal Practice and

15  Procedure, Civil, § 2949 at 471 (1973)).

16  **III.   DISCUSSION**

17        In the instant Motions, Plaintiffs seek a Temporary Restraining Order and Preliminary

18  Injunction, following a hearing, on their First and Fourth Amendment claims. (Pls.' Mots.

19  11:3–15).  Specifically, they request the Court to order Metro to follow its own Use of Force

20  Policy and enjoin Metro from engaging in certain crowd control tactics.[7] (*Id*. 11:3–5).  While

21  Plaintiffs request injunctive relief as to a multitude of crowd control tactics, Plaintiffs only

22  argue that Metro's use of chemical agents against crowds of largely peaceful protestors violated

23

24

25  _____

[7] The Court acknowledges that the parties initially dispute whether Plaintiff seeks a mandatory injunction or a prohibitory injunction. (*See* Defs.' Mots. 18:21–21:8); (Pls.' Mots. 3:22–4:20).  Because the Court ultimately finds that Plaintiffs cannot meet their burden under the lower standard for a prohibitory injunction, the Court need not reach a conclusion regarding the nature of the injunction sought.

Plaintiffs' First and Fourth Amendment rights. (Pls.' Mots. 27:19–25).  Accordingly, the Court analyzes Plaintiffs' request as to Metro's use of chemical irritants under the four *Winter* factors and addresses each in turn.

**A. Likelihood of Success on the Merits**

As a preliminary matter, the Court finds that Plaintiffs must show a likelihood of success against Defendants under *Monell*, in addition to showing a likelihood of success on their underlying First and Fourth Amendment claims. *See Martinez v. City of Santa Rosa*, No. 20-CV-04135-VC, 2020 WL 5074262, at *1 (N.D. Cal. Aug. 27, 2020) (denying plaintiffs' request to enjoin the City of Santa Rosa from using tear gas and projectiles during protests because plaintiffs failed to show a likelihood of success on municipal liability). Plaintiffs request an injunction against Metro, not specific officers, and therefore, must show that Metro's alleged violations occurred pursuant to a municipal policy or custom. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) (finding that municipal defendants may be held liable on a Section 1983 claim if the action alleged shows a custom of constitutional deprivations). The Court begins with analyzing Plaintiffs' First Amendment claim.

a.   First Amendment Claim

Plaintiffs argue that there is a likelihood of success on the merits regarding their First Amendment retaliation claim because: (1) Plaintiffs were engaged in a constitutionally protected activity; (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected activity; and (3) protected activity was a substantial or motivating factor in Defendants' conduct. (Pls.' Mots. 27:27–28:5). Defendants do not dispute that protesting is a constitutionally protected activity. (Defs.' Resp. 30:27–28). Instead, they argue that Defendants' actions have not chilled individuals from protesting because protests continue to occur throughout Las Vegas and protestors who attended the first few protests continued to attend protests thereafter. (*Id*. 31:7–10). Defendants further argue that their use of tear gas and other projectiles was not motivated by Plaintiffs' protests but rather in the interest of maintaining public safety. (*Id*. 31:17–19). Because Defendants do not contest Plaintiffs' first argument, the Court turns the remaining elements of Plaintiffs' First Amendment claim.

1

2          *i. Chilling Effect*

3          Plaintiffs claim that Metro's conduct has chilled Plaintiffs and other protestors from

4   participating in, or working as legal observers at, ongoing Black Lives Matter ("BLM") protests

5   out of a fear for their safety and frustration with complying with Defendants' seemingly

6   contradictory orders to disperse. (Pls.' Mots. 31:25–28).  In support of their claim, Plaintiffs

7   allege that Plaintiffs Sanchez, Kenady, and Molina have been chilled from participating in or

8   legally observing future protests. (*Id.* 32:2–33:19).

9          In analyzing the chilling effect, "the proper inquiry asks whether an official's acts would

10  chill or silence a person of ordinary firmness from future First Amendment activities."

11  *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal

12  quotation marks and citations omitted).  "Ordinary firmness" is an objective standard that will

13  not "allow a defendant to escape liability for a First Amendment violation merely because an

14  unusually determined plaintiff persists in his protected activity." *Black Lives Matter Seattle-*

15  *King Cty.*, 466 F. Supp. at 1213 (citing to *Mendocino Envtl. Ctr.*, 192 F.3d at 1300).  The mere

16  threat of harm, without further action, can have a chilling effect. *Id.* (citing *Brodheim v. Cry*,

17  584 F.3d 1262, 1270 (9th Cir. 2009)).

18         Here, Metro's use of pepperballs and tear gas to control crowds during the May 30, 2020

19  and June 13, 2020 protests have likely chilled speech.  The Court finds that a person of ordinary

20  firmness would likely be chilled from participating in a protest if shot at with pepperballs, tear

21  gas, or other projectiles after peacefully protesting.  The Court's conclusion is further aided by

22  evidence that several of the Plaintiffs were, in fact, chilled from engaging in protected speech.

23  Molina, a legal observer at the June 13, 2020 protest, claims that she has not attended any

24  protests because of her experience at the June 13, 2020 protest where she was exposed to

25  chemical irritants and detained. (Molina's Decl. ¶ 63).  Kenady, a veteran protestor who has

    attended demonstrations over the past twenty years, also testified that she has "felt chilled from

protesting out of frustration with how the police have treated protestors." (Kenady's Decl. ¶ 11).  While she is not afraid, she is "frustrated by the confusion that [the protestors] felt when it was unclear how [they] were supposed to comply with the police's orders when so many directions were blocked." (Kenady's Decl. ¶ 11).  These declarations evidence that Metro's actions have effectively deterred some Plaintiffs from organizing and protesting and, therefore, have actually chilled some Plaintiffs from engaging in their First Amendment rights.

Defendants argue their crowd control tactics did not effectively chill speech because many Plaintiffs who attended the first few night of protests where chemical irritants were used continued to attend protests thereafter. (Defs.' Mots. 31:7–8).  Only two Plaintiffs, Sanchez and Martin, continued to attend protests after the May 30, 2020 protest.  Sanchez and Martin appear to be more involved than the average protestor—to date, they have organized three out of the four cited protests. (Sanchez's Decl. ¶ 4) (Martin's Decl. ¶ 3).  Sanchez and Martin, therefore, may be considered outliers who are "unusually determined [. . .] to persist" in protesting and organizing protests. *Mendocino Envtl. Ctr.*, 192 F.3d at 1300.  However, even Sanchez herself has stated that, after the July 4, 2020 protest, she has felt "discouraged from organizing future protests out of fear for how . . . people . . . will be treated by police." (Sanchez's Decl. ¶ 55).  Given that the standard for chilling effect is whether Metro's actions deterred or silenced a person of *ordinary firmness* from exercising his or her constitutionally protected activity, Plaintiffs have demonstrated from the declarations of Sanchez, Kenady, and Molina that Metro's use of chemical irritants as a crowd control tactic has likely chilled speech.

Additionally, Defendants argue that their actions have not chilled Plaintiffs and other protestors from participating in additional protests because protests continue to occur throughout Las Vegas. (Defs.' Mots. 31:7–9).  Showing the continued existence of protests does not demonstrate that Metro's conduct has failed to chill or deter individuals of "ordinary firmness" from participating in protests.  There is no indication that the individuals continuing

to protest are even aware of Metro's crowd control tactics at issue. (*See* List of Protests, Ex. C to Defs.' Resp., ECF No. 25-3).  This argument is further contradicted by the fact that Plaintiffs have shown actual chilling, as explained above.  For these reasons, the Court finds that Plaintiffs have shown a likelihood of success on the second element of their First Amendment retaliation claim.

### ii.  Motivation for Defendants' Actions

In addition to showing that Defendants' actions chilled protected speech, Plaintiffs must demonstrate that there is a likelihood of success that Metro's decision to use chemical irritants was motivated by Plaintiffs' protected speech.  Here, Plaintiffs argue that because Plaintiffs were peaceful, "no other rationale explains Metro's use of teargas and pepperballs other than that Metro perceived the Plaintiffs and other protestors as threats because of their message about police brutality." (Pls.' Mots. 34:27–35:2).  Contrary to Plaintiffs' allegation, Metro alleges legitimate reasons for why it decided to use chemical irritants during the May 30, 2020 and June 13, 2020 protest. (Defs.' Mots. 32:2–11).  Regarding the June 13, 2020 protest, Lt. O'Daniel testified that she deployed SWAT due to a valid concern that protestors would overtake the Interstate-15 on-ramp, like they had done during the May 30, 2020 protest. (Lt. O'Daniel's Decl. ¶ 47).  This concern was further validated by Facebook Live videos in which protestors expressed their intent to overtake the Interstate-15 highway. (*Id*.).  Regarding the May 30, 2020 protest, Lt. O'Daniel testified that she deployed SWAT due to protestors' refusal to obey officer commands and the size of the crowd. (*Id*. ¶ 29).  Lt. O'Daniel's testimony demonstrates that, unlike Plaintiffs' allegation, Metro had articulable reasons for using teargas and pepperballs during the two protests.  Accordingly, because Defendants allege valid motivations behind Metro's decision to use chemical irritants during the May 30, 2020 and June 13, 2020 protests, the Court finds that Plaintiffs cannot show a likelihood of success that Metro's use of chemical irritants was motivated by Plaintiffs' protected speech.

Plaintiffs additionally point to two separate accounts as evidence that Defendants were motivated to use chemical irritants by Plaintiffs' protesting: (1) Plaintiff Downes-Covington's detention on June 1, 2020; and (2) Plaintiffs Driscoll's and Molina's detentions on June 13, 2020. (Pls.' Replies 9:10–11, ECF No. 30–31).  While Plaintiffs allege chilling effect based on Metro's use of pepperballs and tear gas, Plaintiffs' claims regarding the motivation behind Metro's actions concern a separate allegation, namely Metro's use of force while detaining peaceful protestors.  Because these incidents involve qualitatively different forces, they provide low probative value regarding officers' motivations for using chemical irritants.

Because Plaintiffs fail to show that Metro was motivated by Plaintiffs' protected speech, the Court finds that Plaintiffs have failed to meet their burden as to the third element of a First Amendment claim.  Accordingly, for these reasons, the Court finds that Plaintiffs have failed to show a likelihood of success on the merits of their First Amendment claim.

### b.  Fourth Amendment Claim

Plaintiffs argue that Metro used excessive force in violation of the Fourth Amendment right against unreasonable seizures by firing chemical irritants during the protests on May 30, 2020; June 1, 2020; June 13, 2020; and July 4, 2020.[8] (Pls.' Mots. 35:11–36:23).  They argue that the severity of the crime (i.e. citations for failure to walk on sidewalk when provided in violation of Nevada Revised Statutes § 484B.297(1)) and the peacefulness of the protests did not warrant Metro's use of pepperballs and tear gas. (*Id.*).  Defendants, in their Responses, argue the following: (1) Plaintiffs overgeneralize the Fourth Amendment claims such that they cannot meet their burden to show that each use of force was excessive; and (2) Metro's use of

---

[8] The Court limits its analysis to the May 30, 2020 protest and June 13, 2020 protest because: (1) Plaintiffs fail to rebut Defendants' allegation that Metro was not involved in deploying chemical irritants against Plaintiff Downes-Covington on June 1, 2020; and (2) Plaintiffs do not allege that Metro used pepperballs, tear gas and other chemical irritants during the July 4, 2020 protest.

force against Plaintiffs was minimal, and thereby, reasonable in light of the unruly and violent crowds during the protests. (Defs.' Resp. 23:23–25:9).

Excessive force claims are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) (internal quotation marks and citations omitted).

In assessing the reasonableness of force used, the Ninth Circuit examines "the Graham factors" (*Graham v. Connor*, 490 U.S. 386 (1989)), including "the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Velazquez*, 793 F.3d at 1025 (quoting *Graham*, 490 U.S. at 396). The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions. *Graham*, 490 U.S. at 396–97.

Plaintiffs allege that Metro unlawfully deployed pepperballs and tear gas in three different protests—May 30, 2020; June 1, 2020; and June 13, 2020. (Pls.' Mots. 15:13–15, 16:13–14, 18:1–3, 22:14–16). The incidents of the June 13, 2020 protest suggest that, in at least one protest, Metro excessively used force by deploying pepperballs and/or tear gas at non-violent protestors. In a video documenting the event, protestors are seen retreating from a tank flanked by two officers saying, "This area is closed. You are on private property. Leave this area now. This street is closed." (Ex. 27 to Pls.' Mots.). Lt. O'Daniel claims that protestors refused to comply with Metro's dispersal order, which prompted her to deploy SWAT. (Lt.

1  O'Daniel's Decl. ¶¶ 46–48).  Plaintiffs allege that they were blocked: "they could not go

2  forward over the freeway and could not go backward because police were blocking [them]."

3  (Sanchez's Decl. ¶ 31); (*see also* Driscoll's Decl. ¶ 18); (*see also* Kenady's Decl. ¶ 7).  While

4  the timing of this video is unclear, it appears that, at the time the video was taken, protestors

5  were complying with Metro's dispersal orders to move away from the Interstate-15 highway.

6  (Video titled BLM-TRO133, Ex. 24 to Pls.' Mots.).  Protestors, in the video, are seen retreating

7  away from the Interstate-15 on-ramp, mostly walking on the sidewalk, although due to the size

8  of the crowd, some trickle onto the street where other officers are stationed. (*Id.*).  While

9  retreating, officers by the tank are seen firing some chemical irritant,[9] as seen by hearing

10  various pop noises. (*Id.*).  None of the Plaintiffs were directly hit, but they suffered from

11  exposure to the pepperballs. (Pls.' Mots. 22:24–26).

12         Analyzing the *Graham* factors, the severity of the crime, here, appears to be minimal.

13  Some protestors violated NRS § 484B.297(1) by failing to stay on the sidewalk.  At the time

14  the video was taken, protestors were retreating away from the on-ramp, in compliance with

15  Metro's dispersal orders. (Video titled BLM-TRO133, Ex. 24 to Pls.' Mots.).   Furthermore,

16  none of the protestors appeared to pose an immediate threat. (*Id.*).  Some protestors raised their

17  hands in a sign of peace while retreating from the officers. (*Id.*).  While Defendants claim that

18  protestors threatened to overtake the highway on-ramp, the video suggests that the protestors,

19  during the 50-second video, complied with Metro's dispersal orders and retreated away from

20  the highway on-ramp.  Although Plaintiffs were not directly hit, Plaintiffs testified that their

21  eyes burned, some had difficulty breathing and some of their personal property was damaged,

22  as seen in the video. (Sanchez's Decl. ¶33); (Kenady's Decl. ¶ 9); (Martin's Decl. ¶ 52–53);

23  (Molina's Decl ¶¶ 29–32).  Metro's use of pepperballs on retreating and seemingly compliant

24  protestors appears unreasonable in light of the minimal threat the protestors posed.

25

[9] It is unclear whether the irritants are tear gas cannisters or pepperballs.

Defendants argue that Plaintiffs and other protestors present at the June 13, 2020 protests were not "seized" for purposes of the Fourth Amendment and therefore, cannot claim that Metro used excessive force against them. (Defs. Mots. 25:13–17). Even though the Plaintiffs were not directly hit by pepperballs or tear gas, Plaintiffs were still "seized" for purposes of the Fourth Amendment. *See Rodriguez*, 819 F. Supp. 2d at 946 (finding that a subject "can . . . be seized for Fourth Amendment purposes if that person was the deliberate object of the excursion of force intended to terminate the freedom of movement"). It does not appear that Metro hit any of the Plaintiffs or protestors present at the June 13, 2020. Plaintiffs also admit this. (Pls.' Replies 7:13–14). Nevertheless, the Metro's formation at the incident— with two officers and a tank corralling the protestors away from the on-ramp and two or more officers blocking the street—suggests that protestors were seized when Metro pushed the protestors away from the Interstate-15 on-ramp. (*See* Ex. 24 to Pls.' Mots.); *see also Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (finding that "a person is seized . . . when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied"). Given that the standard for injunctive relief is a likelihood of success, the Court finds that the video evidence from the June 13, 2020 incident coupled with the various declarations by the Plaintiffs present at the protest suggest that Plaintiffs have met their burden as to the elements of a Fourth Amendment claim.

### c. *Monell* Liability

Defendants argue that Plaintiffs cannot demonstrate a likelihood of success on the merits against Metro under *Monell* because: (1) Plaintiffs did not address the *Monell* issue in their Motions; and (2) Plaintiffs' requested relief, specifically that the Court order Metro to comply with its own Policy, is effectively an admission that Metro's Use of Force Policy is constitutional. (Defs.' Resp. 23:15–21). Plaintiffs, in their Reply, argue that Metro's actions

demonstrate that Metro does not follow its own policy, evidencing instead a custom of unconstitutional conduct. (Pls.' Replies 6:4–8).

To bring a claim for deprivation of a constitutional right by a municipality, a plaintiff must establish: "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the [P]laintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389–91 (1989)); *Monell*, 436 U.S. at 690 (1978).  However, if a plaintiff's *Monell* claim is not based on a formal rule, regulation or policy, the plaintiff must demonstrate that "[t]he custom [is] so persistent and widespread that it constitutes a permanent and well settled city policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Monell*, 436 U.S. at 690–91 (finding that "local governments . . . may be sued for constitutional deprivations . . . pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels").

In this case, for Plaintiffs to obtain injunctive relief against Metro, Plaintiffs must also demonstrate a likelihood of success that the officers were acting pursuant to an official policy or custom. *See Martinez v. City of Santa Rosa*, No. 20-CV-04135-VC, 2020 WL 5074262, at *2 (N.D. Cal. Aug. 27, 2020) (holding that plaintiffs, in seeking injunctive relief against a municipal defendant, must also address their likelihood of success on a *Monell* claim). Specifically, regarding the remaining Fourth Amendment claim, Plaintiffs must demonstrate that Metro had a policy or custom of firing tear gas and projectiles into a peaceful crowd. Regarding the First Amendment claim, Plaintiffs must demonstrate that Metro had a policy or custom of retaliating against protestors in a constitutionally protected activity.

Here, Plaintiffs appear to only address the Fourth Amendment claim.[10]  Plaintiffs, in their Replies, suggest that Metro's decision to fire tear gas and projectiles into the crowd was pursuant to an unconstitutional custom of shooting pepperballs at non-violent people and exposing non-threatening individuals to chemical irritants. (Pls.' Replies 6:6–8).  In support of their claim, Plaintiffs point to two instances: (1) Metro shooting pepperballs at O'Brien during the May 30, 2020 protest and (2) Metro exposing Driscoll, Martin, Molina, and Sanchez to chemical irritants. (*Id*.).  While it is unclear whether there is an official policy or custom motivating the alleged constitutional violations, the video and testimonial evidence presented by Plaintiffs suggest that, at least on two occasions, police fired pepperballs at non-violent protestors. *See Breathe v. City of Detroit*, No. 20-12363, 2020 WL 5269789, at *5 (E.D. Mich. Sept. 4, 2020) (finding that one instance of an alleged constitutional violation was sufficient for Plaintiff to show a likelihood of success on the merits regarding *Monell* liability).

Regarding the first encounter on May 30, 2020, declarations by O'Brien, Sanchez, and Martin suggest that Metro fired pepperballs on non-violent protestors.  As to O'Brien, Metro shot projectiles at him while he observed the May 30, 2020 protest as a legal protestor. (O'Brien's Decl. ¶¶ 4–5, 17–19).  Metro, Defendants argue, fired projectiles in an effort to gain control over an unruly crowd and O'Brien was unfortunately caught in the chaos. (Defs.' Mots. 12:26–27).  The videos documenting the May 30, 2020 protest show a large crowd of protestors

---

[10] Plaintiffs, in their Replies, argue that Metro's Use of Force Policy, while constitutional, "is only effective if [it is] enforced and followed." (Pls.' Replies 6:1–8).  This argument appears to solely address Plaintiffs' Fourth Amendment claim.  Plaintiffs otherwise fail to argue that Metro followed a custom or policy of retaliating against protestors for their protected speech in their Motions and Replies.  Accordingly, because Plaintiffs only discuss Metro's practice as to a Fourth Amendment violation in their briefings, the Court finds that Plaintiffs fail to show a likelihood of success on a *Monell* claim as to the First Amendment.

Even assuming Plaintiffs provided evidence in support of their *Monell* claim elsewhere in their briefing, the Court finds that Plaintiffs have otherwise failed to demonstrate a pattern or practice as to their First Amendment claim based on the claims alleged.  As explained, Plaintiffs cannot demonstrate a likelihood of success on the merits of a First Amendment claim.  As such, the Court finds that Plaintiffs also cannot demonstrate a pattern or practice of Metro's First Amendment violations.

1   at the Container Park, with most protestors organizing on the sidewalk and some overflowing

2   onto the streets due to the size of the crowd. (Exs. E–G to Defs.' Resp.).  There is no strong

3   showing from the videos that the crowd on May 30, 2020 was violent or combative. (*See id*.).

4        Perhaps most probative, Metro appeared to again shoot projectiles with chemical

5   irritants at protestors retreating from the police during the June 13, 2020 protest. (Video titled

6   BLM-TRO133, Ex. 24 to Pls.' Mots.).  While Metro may have been justified in using

7   pepperballs or tear gas in O'Brien's vicinity to control the chaotic crowd, the video and

8   testimonial evidence demonstrates that, at least on May 30, 2020 and June 13, 2020, Metro

9   police failed to follow their Policy when they used tear gas and pepperballs on other non-

10  violent individuals.  Because Plaintiffs must show a likelihood of success that Metro is liable

11  under *Monell*, the Court finds that these two occasions suggest that Plaintiffs have shown a

12  likelihood of success in demonstrating that Metro followed a pattern or practice of

13  unconstitutional conduct as to their Fourth Amendment claim.

14        **B.  Irreparable Harm**

15        In addition to showing a likelihood of success on the merits, Plaintiffs must also

16  establish that they will likely suffer irreparable harm without the issuance of injunctive relief.

17  *Winter*, 555 U.S. at 21.  Plaintiffs must "demonstrate a likelihood of irreparable injury—not

18  just a possibility—in order to obtain preliminary relief." *Id*.  The movement "must show that

19  the harm is certain and great and of such imminence that there is a clear and present need for

20  equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013)

21  (internal quotation marks omitted).  Issuing a preliminary injunction based only on a possibility

22  of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive

23  relief as an extraordinary remedy that may only be awarded upon a clear showing that the

24  plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520

25  U.S. 968, 972 (1997)).  Plaintiffs here argue that they have already suffered irreparable harm to

their First and Fourth Amendment rights and such harm is likely to continue without granted relief. (Pls.' Mots. 39:14–16).  In response, Defendants primarily claim that Plaintiffs cannot show irreparable harm because Metro recently revised their guidelines to better address the use of force during protests and protests continue to occur throughout Las Vegas without incident. (Defs.' Mots. 34:4–35:21).  The Court first discusses Plaintiffs' irreparable harm as to their First Amendment right.

### a. First Amendment Claim

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).  "[U]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quotation marks omitted).  Here, Plaintiffs have failed to demonstrate the existence of a colorable First Amendment claim—both regarding the merits and *Monell* liability.  Despite the fact that the loss of First Amendment freedoms is considered an irreparable injury as a matter of law, the Court finds that Plaintiffs have failed to demonstrate irreparable injury as to their First Amendment claim because Plaintiffs have failed to demonstrate a likelihood of success on the merits.

### b. Fourth Amendment Claim

Unlike the First Amendment claim, courts have not held that Fourth Amendment deprivations are irreparable injuries as a matter of law. *Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (noting that cases in which the alleged deprivation of constitutional right constitutes irreparable harm, "are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other rights as to which the temporary deprivation is viewed of such qualitative importance as to be irremediable

by any subsequent relief").  To demonstrate irreparable injury as to their Fourth Amendment injury here, Plaintiffs must demonstrate a likelihood, not a mere possibility, of future irreparable injury of the same character. *Winter*, 555 U.S. at 21.

Here, Plaintiffs moved for a Temporary Restraining Order on November 18, 2020. While Plaintiffs allege that "peaceful protests in Las Vegas . . . are ongoing and show no sign of ending," Plaintiffs fail to provide sufficient evidence to support this claim. (Pls.' Mots. 39:3–5).  Defendants provided a log of protests (with the most recent protest on December 2, 2020); however, these protests have largely been peaceful. (*See* List of Protests at 10).  Plaintiffs point to the protest on September 23, 2020 to show that protests have continued in Las Vegas through the summer and into the fall. (Pls.' Mots. 10:7).  There is, however, no indication that Metro deployed similar tactics at the September 23, 2020 protest. (Las Vegas Review-Journal Article dated September 23, 2020, Ex. 8 to Pls.' Mots., ECF No. 15-8)  Plaintiffs fail to show that Metro has used any of the conduct that they seek to enjoin since May 30, 2020 and further, fail to allege facts that plausibly demonstrate that these events will likely occur imminently.

Plaintiffs request that this Court follow the decisions in three similar cases where courts found irreparable harm and enjoined the police's use of certain crowd control tactics in Washington, Oregon, and Colorado. *See Black Lives Matter Seattle-King Cty.*, 466 F. Supp. at 1214; *see also Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150 (D. Or. 2020); *see also Abay v. City of Denver*, 445 F. Supp. 1286 (D. Colo. 2020).  In all three cases, the plaintiffs sought injunctive relief while protests were ongoing during the height of protests after the killing of George Floyd.  Courts there decided to grant injunctive relief in light of these protests in June 2020, issuing their orders within the span of one week.[11]  While these cases

---

[11] The Court issued their decisions in *Black Lives Matter Seattle-King Country* on June 12, 2020; *Don't Shoot Portland* on June 9, 2020; and *Abay* on June 5, 2020.

allege similar facts to those at issue here, the context in which courts granted injunctive relief in June 2020 differ from the context in this case.

   While Plaintiffs may face the same harm in the future, there is no showing that Plaintiffs will likely suffer irreparable harm now without injunctive relief.  There is a possibility that another protest may occur in the coming weeks and that such protests could uncharacteristically require Metro to use its alleged crowd control tactics.  However, showing a mere possibility of irreparable injury is insufficient. *See Winter*, 555 U.S. at 22 (citing *Mazurek*, 520 U.S. at 972). Because demonstrating a mere possibility is insufficient to obtain preliminary relief, the Court finds that Plaintiffs have not met their burden in showing irreparable harm as to their Fourth Amendment claim.[12]

### C.  Balance of Hardships and Public Interest

   When the government is a party, the last two factors for injunctive relief merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).  In support of their request for injunctive relief, Plaintiffs claim that the risk of harm to Plaintiffs and the public significantly outweighs the harm to Defendants. (Pls.' Mots. 40:22–28).  Defendants contest that there is a strong public interest in maintaining order and public safety. (Defs.' Resp. 36:6–7).

   Regarding the balance of hardships, "courts must weigh 'the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *See Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp.3d 1161, 1178 (C.D. Cal. 2017) (quoting *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).  As to public interest, "it is always in the public interest to prevent the violation of a party's constitutional

---

[12] Defendants also argue that because Metro revised its policies on September 15, 2020, Plaintiffs cannot show irreparable harm. (Defs.' Motions. 34:4–24).  Because the Court already finds that Plaintiffs cannot met their burden in showing irreparable harm, the Court declines to address Defendants' additional argument.

1  rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks

2  omitted).

3        Defendants admit that there is a strong interest in preserving the right of peaceful

4  assembly. (Defs.' Resp. 36:3). However, they argue that Plaintiffs fail to consider other

5  interests, including the safety of officers and the public. (*Id*. 5–9). While many individuals

6  (including Plaintiffs) peacefully protested, others attempted to take over the city's main

7  highways, impeded roadways, blocked traffic, and looted businesses. (*Id*. 25–27). Plaintiffs,

8  however, assert a strong public interest: "it is always in the public interest to prevent the

9  violation of a party's constitutional rights." *Padilla v. Immigration & Customs Enf't*, 953 F.3d

10  1134, 1147–48 (9th Cir. 2020). On balance, Plaintiffs' requested relief appears tailored to

11  stopping Metro's use of crowd control methods on peaceful protestors. Plaintiffs do not request

12  injunctive relief to broadly ban Metro's crowd control tactics. Their request limits Metro's use

13  such that the safety of the protestors and the officers can both be achieved. If relief were

14  granted, Metro would not be enjoined from employing other uses of force to protect against

15  looting, property damage or other threats to public and officer safety. Given the public interest

16  at stake and the minimal restrictions Plaintiffs' request entails, the Court finds that the balance

17  of factors weighs in favor of the Plaintiffs.

18        However, although the balance of hardships and public interest favor Plaintiffs, the

19  Court ultimately finds that Plaintiffs have not met their burden as to their First Amendment and

20  Fourth Amendment claims. Regarding their First Amendment claim, Plaintiffs fail to show the

21  likelihood of success for Metro's liability under *Monell* and for Plaintiffs' underlying First

22  Amendment claim. Specifically, Plaintiffs cannot show that Metro's use of chemical irritants

23  was motivated by Plaintiffs' protected speech. Because Plaintiffs fail to demonstrate success

24  on the underlying merits of their First Amendment claim, Plaintiffs accordingly cannot

25  demonstrate Metro's liability under *Monell*. As to their Fourth Amendment claim, Plaintiffs

fail to show a likelihood of irreparable harm in light of Metro's excessive crowd control tactics. For these reasons, the Court denies Plaintiffs' request for a Temporary Restraining Order and Preliminary Injunction.

## IV.   <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, (ECF Nos. 15, 16), are **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Excess Pages, (ECF No. 14), and Defendants' Motion for Leave to File Excess Pages, (ECF No. 23), are **GRANTED** *nunc pro tunc*.

**DATED** this __17__ day of December, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court